**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| X CORP., <br><br> *Petitioner*, <br><br> v. <br><br> NATIONAL MUSIC PUBLISHERS' ASSOCIATION <br><br> *Respondent*. | Misc. Case No.: <br><br> Underlying Action: <br><br> *Concord Music Group, Inc., et al. v. X Corp., D/B/A Twitter*, Case No. 3:23-CV-00606 (M.D. Tenn.) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF X CORP.'S MOTION TO COMPEL NATIONAL MUSIC PUBLISHERS' ASSOCIATION TO COMPLY WITH SUBPOENA TO PRODUCE DOCUMENTS**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

    A.   NMPA's Notice Program.......................................................................................... 3

    B.   Mr. Israelite's Involvement..................................................................................... 4

    C.   The Tennessee Action And Mr. Israelite's Commentary ............................................. 6

    D.   NMPA's Refusal To Search Israelite's Documents And Failure To Produce Critical Documents ..................................................................................................................... 8

LEGAL STANDARD.............................................................................................................. 11

ARGUMENT ......................................................................................................................... 12

    I.   NMPA SHOULD BE COMPELLED TO PRODUCE DOCUMENTS FROM MR. ISRAELITE'S CUSTODIAL FILES ................................................................................. 12

    A.   Mr. Israelite Has Relevant Documents ................................................................... 12

    B.   Searching Mr. Israelite's Documents Will Not Be Unduly Burdensome..................... 15

    II.   NMPA SHOULD BE COMPELLED TO PRODUCE CRITICAL DOCUMENTS THAT IT ALREADY AGREED TO PRODUCE ................................................................... 18

CONCLUSION....................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page**

## Cases

*Axis Ins. Co. v. Am. Specialty Ins. & Risk Servs., Inc.*,
340 F.R.D. 570 (N.D. Ind. 2021) ............................................................21

*Blankenship v. Fox News Network, LLC*,
2021 WL 2345972 (S.D. W. Va. June 8, 2021).....................................17

*Dyson, Inc. v. Sharkninja Operating LLC*,
2016 WL 1613489 (N.D. Ill. Apr. 22, 2016) .........................................17

*\*Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*,
2019 WL 5864595 (D.D.C. Nov. 8, 2019) ........................................11, 15, 16, 21

*Jet Blast, Inc. v. Blue Lake Serv., LLC*,
2025 WL 841612 (N.D. Fla. Feb. 26, 2025)...........................................21

*Jones v. Varsity Brands, LLC*,
2021 WL 5889984 (W.D. Tenn. Dec. 13, 2021) ....................................14

*Meixing Ren v. Phoenix Satellite Television (US), Inc.*,
2014 WL 12792707 (D.D.C. Oct. 14, 2014) ..........................................11

*Novi Footwear Int'l Co. v. Earth OpCo LLC*,
740 F. Supp. 3d 73 (D. Mass. 2024)......................................................21

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*,
322 F.R.D. 1 (D.D.C. 2017).....................................................................14

*Page v. Bragg Communities, LLC*,
2022 WL 17724407 (E.D.N.C. Dec. 15, 2022) .....................................17

*Ray v. BlueHippo Funding, LLC*,
2008 WL 4830747 (N.D. Cal. Nov. 6, 2008) .........................................17

*Rosales v. FitFlop USA, LLC*,
2013 WL 12416060 (S.D. Cal. Jan. 4, 2013)..........................................17

*Rosinbaum v. Flowers Foods, Inc.*,
238 F. Supp. 3d 738 (E.D.N.C. 2017).....................................................17

*Stati v. Republic of Kazakhstan*,
2020 WL 3259244 (D.D.C. June 5, 2020) .............................................15

*United Biologics, LLC v. Amerigroup Tennessee, Inc.*,
  2022 WL 2286197 (E.D. Tenn. June 23, 2022)........................................................19

## **Statutes / Rules**

17 U.S.C. § 106..........................................................................................................3

17 U.S.C. § 501..........................................................................................................3

17 U.S.C. § 504........................................................................................................16

Fed. R. Civ. P. 26.....................................................................................................16

Fed. R. Civ. P. 45...............................................................................................11, 18

## INTRODUCTION

Petitioner X Corp. ("X") respectfully seeks the assistance of this Court to compel compliance with a subpoena it issued to the National Music Publishers' Association ("NMPA") in connection with litigation in the Middle District of Tennessee, *Concord Music Group v. X Corp., d/b/a Twitter*, Case No. 3:23-cv-00606 (M.D. Tenn.) ("the Tennessee Action").

X owns and operates an online social media platform formerly known as Twitter. To post content to the platform, users must agree to X's Terms of Service, which expressly prohibit use of the platform for unlawful purposes, including for copyright infringement. Plaintiffs in the Tennessee Action are 18 music publishing companies. Plaintiffs filed the lawsuit in the Tennessee Action against X for copyright infringement, seeking relief based on music allegedly posted by users of X. While NMPA is not a named plaintiff in the Tennessee Action, NMPA plays a critical role in the underlying allegations. As alleged in their complaint, Plaintiffs are all members of NMPA, a trade organization, who acted "through NMPA" to identify alleged copyright infringement and to send notices of infringement to X. Ex. 1 (Am. Compl.) ¶ 10. These actions— the identification of alleged copyright infringement on the X site by NMPA and the notifications that NMPA sent to X regarding them—form the factual basis upon which Plaintiffs' sole remaining claim against X for contributory copyright infringement is predicated. It is not disputed that NMPA conceived of and controlled the process that led to this litigation.

On March 5, 2025, X duly served a subpoena requesting documents from NMPA. NMPA, which shares the same counsel as Plaintiffs in the Tennessee Action, agreed to search for and produce documents from only one custodian—Kerry Mustico, NMPA's Senior Vice President of Legal & Business Affairs, and a former Senior Counsel at the law firm representing Plaintiffs and NMPA, and from some shared drives. There are two problems with NMPA's position.

*First,* NMPA's refusal to search the files of more than one custodian is unjustified. NMPA should be ordered to search the custodial files of a second custodian, David Israelite, NMPA's President and CEO. Mr. Israelite not only oversees NMPA, which NMPA's counsel has described as a lean, 15-person organization, but also was heavily involved in the underlying notice program and allegations of copyright infringement against X. Mr. Israelite ███████████████. Additionally, he has spoken *about the lawsuit* to the press extensively. Given these known communications, Mr. Israelite is a key custodian who is very likely to have additional responsive documents which X otherwise cannot obtain. Fact discovery in the Tennessee Action closes on July 17, 2025. X therefore asks this Court to require NMPA to add Mr. Israelite as a custodian (for a total of two custodians), because he almost certainly has communications in his files relevant to the Tennessee Action that do not overlap with Ms. Mustico's ████████████████████████ ████████████ NMPA should not be permitted to shield Mr. Israelite's documents from production.

*Second*, NMPA has not honored its production commitments to date. In response to X's subpoena, NMPA initially agreed to produce various, critical categories of documents, including documents about (i) the method by which NMPA Notices would be submitted to X; (ii) whether to follow-up with X regarding any alleged infringement continuing to appear on the X platform or about requesting the termination or suspension of any specific users; (iii) any presentations or reports about the NMPA Notice program; and (iv) ████████████████████ Nearly three months after having been served with this subpoena, NMPA has not produced any of these documents. Its production deficiencies and ongoing delays are deeply troubling, prejudicial to X, and warrant Court intervention at this point.

Given the limited time available for fact discovery in this case, X can no longer afford delay. It respectfully requests that the Court: (1) order NMPA to include Mr. Israelite as a custodian and produce responsive documents from his files; and (2) order NMPA to immediately produce the categories of documents identified herein.

## **BACKGROUND**

### A.    **NMPA's Notice Program**

Plaintiffs are 18 "major and independent music publishing companies." Ex. 1 (Am. Compl.) ¶¶ 2, 18-96.[1]  Plaintiffs sued X on June 14, 2023, alleging that X is liable for direct, contributory, and vicarious copyright infringement under the Copyright Act, 17 U.S.C. §§ 106 and 501. X users have the ability to include "video (including audio) in a [post]" and to view "a video attached to a [post]." *Id.* ¶¶ 112, 115.  Plaintiffs allege that users sometimes post content on X "containing Publishers' copyrighted music." *Id.* ¶ 146.  Plaintiffs contend that they identified instances of infringement and provided notice to X regarding this alleged infringement pursuant to the Digital Millennium Copyright Act ("DMCA"). *Id.* ¶¶ 10, 149.  Plaintiffs contend that X's response to these notices of infringement was insufficient. *Id.* ¶ 10.  Following a ruling on X's motion to dismiss the complaint, Plaintiffs have one pending claim for contributory infringement in violation of the Copyright Act remaining. *See infra* Section C.

Plaintiffs allege that NMPA controlled both steps of the notice process. First, according to Plaintiffs, they acted "through NMPA," and it was NMPA (not Plaintiffs themselves) that "spent significant time and resources to identify specific infringers and specific infringements" of their publishing rights on X. Ex. 1 (Am. Compl.) ¶ 10.  Plaintiffs further allege that it was NMPA (again, not Plaintiffs themselves) that provided notices of alleged infringement to X, specifically

---

[1]  X's referenced exhibits are attached to the Declaration of Dylan I. Scher ("Scher Declaration").

alleging that "NMPA, acting on behalf of [Plaintiffs], began sending formal infringement notices to [X] on a weekly basis" in December 2021 on behalf of Plaintiffs. *Id.* ¶ 149. In this regard, NMPA is not a typical non-party with tangential or limited involvement to the case; to the contrary, Plaintiffs' entire case is premised on the actions of NMPA.

### B.    Mr. Israelite's Involvement

Mr. Israelite has been the President and CEO of NMPA since 2005. Ex. 17 (https://www.nmpa.org/people/david-israelite/). NMPA describes Mr. Israelite's role as "overseeing all aspects of NMPA's operations, from legal strategy and implementation to government affairs and advocacy." *Id.*



Mr. Israelite ███████████████████████████████ *See* Ex. 6 (NMPA0000000001) at 002-003. He stated that he ████████████████████████ ████████████████████████ *Id.*

Mr. Israelite claimed that his ████████████████████████████ ███████████████████████ *Id.* ███████ ████████████████████████████████████ ████████████████████████████████████ ███████████████ *Id.* at 001. However, he then said ████████████ ████████████████████████████████████ ████████████████████████████ *Id.*



NMPA began sending notices ("NMPA Notices") to X

Ex. 7 (PL0000127282).

Ex. 8 (PL0000127314); *cf.* Ex. 1 (Am. Compl.) ¶ 150 ("Each NMPA Notice contained thousands of links to specific tweets").

*See, e.g.*, Ex. 9 (PL0000012196) (

); Ex. 10 (PL0000013626) (                              ); Ex. 11 (PL0000019063) (

); Ex. 12 (PL0000139722) (                                       ).[2]

---

[2]  While there is no standard for how many characters are on a page, using some estimates, 128,000 characters would be the equivalent of somewhere between 68 to 104 typed pages. https://en.wikipedia.org/wiki/Standard_page.



████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████

Even though NMPA was sending "weekly" notices (Ex. 1 (Am. Compl.) ¶ 149), and

████████████████████████████████████████████, NMPA did

not send any follow-up correspondence regarding the extent to which any videos or user accounts

identified in these notices had been taken down or disabled.  And although Plaintiffs criticize X's

anti-infringement program, the Complaint implicitly acknowledges that X has removed hundreds

of thousands of the accused posts. *Id.* ¶¶ 158, 161.

Mr. Israelite was deeply involved in NMPA's ██████████████ Documents produced

by Plaintiffs in the Tennessee Action ████████████████████████████████

██████████████████████████████ *See* Ex. 13 (PL0000312482) at 482 ██

████████████████████████████████████████; Ex. 14

(PL0000319652) at 653 ██████████████████████████████

████████████████████████████████████████

████████████ *see also* Ex. 15 (NMPA0000002544) at 544 ██████████████

████████████████████████.[3]

## C.    The Tennessee Action And Mr. Israelite's Commentary

Plaintiffs filed the Tennessee Action in June 2023.  *See* Ex. 2 (Motion to Dismiss

Memorandum) at 4.  In March 2024, Judge Aleta Trauger of the United States District Court for

---

[3]  Although Plaintiffs collected and produced documents related to the NMPA Notices that listed
NMPA as a "custodian," Plaintiffs' search and collection did not actually involve a collection of
Mr. Israelite's custodial documents.  Rather, it consisted of a collection of the NMPA Notices and
emails from a single, general mailbox (dmca-notice@nmpa.org) that was used for external
communications about specific NMPA Notices.

the Middle District of Tennessee granted in part X's motion to dismiss, dismissing counts I (direct copyright infringement) and III (vicarious liability) entirely, and also dismissing count II (contributory copyright infringement) in part, limiting it only to infringement attributable to three alleged practices: "(1) providing more lenient copyright enforcement to 'verified' users; (2) failing to act on takedown notices in a timely manner; and (3) failing to take reasonable steps in response to severe serial infringers."  *Id.* at 21; *see also* Ex. 3 (Motion to Dismiss Order).

X subsequently asserted various affirmative defenses against Plaintiffs' sole remaining claim, including that the "statute of limitations bars Plaintiffs' claim" to the extent any alleged infringement "accrued outside the three-year limitations period;" that the safe harbor protects X under the DMCA; and that the "doctrines of waiver and estoppel bar Plaintiffs' claim based on contributory liability." Ex. 4 (Answer to Am. Compl.) at 26-27.  Discovery is set to close on July 17, 2025.  Ex. 5 (Initial Case Management Order) at 3.

Mr. Israelite made public statements regarding the threat of a lawsuit and the lawsuit itself throughout 2023 and 2024.  For example:

- **February 2023, prior to filing the lawsuit:** "Moving on to his 'top legal focus' for the NMPA this year, Israelite called out Twitter … Israelite noted the NMPA has found over 240,000 unique infringements on Twitter.  If Twitter does not take appropriate action to take down infringing material and safeguard against future infringements, Israelite said, 'they could lose their safe harbor.  What does it mean to lose your safe harbor?  It means we now can sue you for copyright infringement.'"  Ex. 19 at 5.

- **June 2023 after filing the lawsuit:** "In a statement, NMPA president David Israelite said … [X] can't 'hide behind the DMCA.'"  Ex. 20 at 4 of 8.

- **August 2023 statement after the motion to dismiss filing:** "David Israelite, CEO of the National Music Publishers' Association (NMPA), which represents the interests of major and independent publishers in the US, said in a statement on Tuesday (August 15) that 'X's response is par for the course …'" Ex. 21 at 2 of 5.

- **March 2024 statement about the pending motion to dismiss:** "I ask him about the NMPA-led lawsuit against Twitter/X … He notes that 'this is the normal flow of a litigation in a federal court of this nature' but says the NMPA is waiting on the final resolution of the motion to dismiss ('Which I am confident we will win') before they can get into the real meat of the litigation – the process of discovery." Ex. 22 at 3 of 6.

### D.    NMPA's Refusal To Search Israelite's Documents And Failure To Produce Critical Documents

Because NMPA is the organization that developed and coordinated the NMPA Notice program at the center of this litigation, X served a subpoena on NMPA on March 7, 2025.  Ex. 23 (Subpoena).

On March 21, 2025, NMPA responded and agreed to produce documents in response to various requests for production, to the extent such documents exist and could be located following a "reasonable and diligent search."  *E.g.*, Ex. 24 at 4-5 (NMPA Response). Specifically, NMPA agreed to produce documents and communications:

- "Concerning the NMPA Notices" (RFP No. 1).

- "Concerning whether to submit NMPA Notices to X via X's Copyright Complaint Form" (RFP No. 5).

- "Concerning the decision to continue to submit NMPA Notices to X via email" (RFP No. 6).

- "Concerning whether to inform X that any Copyrighted Works listed in an NMPA Notice continued to appear on the X platform after the NMPA Notice was sent to X" (RFP No. 8).

- "Concerning whether or not to request that any users of the X platform be terminated or suspended from X, Including copies of any such requests" (RFP No. 10).

*Id.* at 4-5, 8-9, 12; *see also id.* at 5-6, 14-15 (RFP Nos. 2, 13).  Overall, NMPA agreed on March 21, 2025 to search for and produce documents in response to RFP Nos. 1-3, 5-6, 8-10, 13 (*see generally* Ex. 24), and subsequently agreed that it would not withhold documents in response to RFP Nos. 4, 7, 11, 12 (*see* Ex. 25 (4/22/25 email) at 4-5).

### 1. NMPA's Refusal To Search And Produce David Israelite's Files

One week after receiving NMPA's responses, X requested to meet and confer with NMPA regarding, in part, the custodial and non-custodial sources that would be the basis of NMPA's search.  Ex. 25 at 5-7 (3/28/25 email).  The parties conferred on April 8, 2025, and NMPA represented that it would search custodial files for Kerry Mustico only.  *Id.* at 3-5 (4/15 email).[4] NMPA stated that it was unwilling to search Mr. Israelite's custodial files because he is an "apex" individual who did not "operate" NMPA's notice program, while also acknowledging that NMPA is a "lean" organization and that Mr. Israelite oversees all operations of the organization.  *Id.* at 3.

The parties continued to confer by email.  On April 22, 2025, NMPA repeated that Ms. Mustico was the "sole individual at NMPA who operated the program" and that Mr. Israelite "oversees the organization," but "wasn't a part of operating the notice program."  Ex. 25 at 3 (4/22/25 email).  NMPA also claimed that it had already been "undertaking significant burden in response to the subpoena" (*id.* at 4), although it had not yet produced any documents.  *See* Scher

---

[4]  "Prior to joining NMPA in 2019, [Ms. Mustico] was Senior Counsel with" the law firm representing Plaintiffs and NMPA in the Tennessee Action.  Ex. 18 (https://www.nmpa.org/people/kerry-mustico/).

Declaration ¶ 30.  X responded two days later, on April 24, 2025, detailing its objections to NMPA's refusal to search Mr. Israelite's custodial files.  Ex. 25 at 1-2 (4/24/25 email).  NMPA responded on April 30, 2025 and did not change its position, reiterating that Mr. Israelite "did not operate the notice program, period."  *Id.* at 1-2 (4/30/25 email).  Despite extensive discussions, NMPA has refused to change its position, and the parties are at an impasse.  *Id.*; *see also* Ex. 26 at 1-2 (5/27/25 and 5/28/25 emails) (confirming no agreement).

### 2.  NMPA's Failure To Produce Critical Documents

On May 5, 2025, more than six weeks after NMPA served its written responses and objections to X's March 7, 2025 subpoena, X's counsel emailed NMPA's counsel to inquire why NMPA had not yet produced any documents.  Ex. 27 (5/5/25 email).  On May 13, 2025, NMPA made a small production of 325 documents, more than a quarter of which were irrelevant and extraneous email attachments, largely image files automatically appended from email signatures. Scher Declaration ¶ 30.  On May 21, 2025, X emailed NMPA regarding its failure to produce several categories of "highly relevant, responsive documents," including documents about the methods by which NMPA would submit notices to X, about whether NMPA would inform X that any copyrighted works listed in a notice continued to appear on the X platform after a notice was sent, about whether or not to request that any users of the X platform be terminated or suspended from X, about presentations about the NMPA Notices, and ███████████████████  Ex. 26 at 2-3 (5/21/25 email).  Counsel did not respond, but on May 22, 2025, NMPA made a subsequent production of 264 documents, which did not include any of the categories of documents X seeks to compel in this motion.  *See* Scher Declaration ¶ 31.

On May 27, 2025, counsel for X emailed counsel for NMPA regarding its intention to move to compel the production of the highly relevant, responsive documents that are missing from

NMPA's document production. Ex. 26 at 2 (5/27/25 email). Counsel for NMPA stated that they did not think there was a dispute and that they have produced the non-privileged responsive documents that they have identified as a result of their searches. *Id.* at 1-2 (5/27/25 email). With an impending fact discovery deadline looming on July 17, 2025 (*see* Ex. 5 at 3) and no assurance that NMPA will produce responsive documents in a timely manner (if at all), X has no choice but to move to compel the production of these highly relevant categories of documents. *See also* Ex. 26 at 1 (5/28/25 email).

## **LEGAL STANDARD**

"A court from which a subpoena issues pursuant to Federal Rule of Civil Procedure 45 has the power to compel production of documents from a nonparty witness." *Meixing Ren v. Phoenix Satellite Television (US), Inc.*, 2014 WL 12792707, at *2 (D.D.C. Oct. 14, 2014). "Discovery obtained from a nonparty pursuant to Rule 45 has 'the same scope as provided in Rule 26(b), thus promoting uniformity.'" *Id.* (quotations omitted). "In general, under Rule 26(b), parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." *Id.* (quotations and brackets omitted).

"The burden lies on the party resisting discovery to show that the documents requested are either unduly burdensome or privileged." *Meixing Ren*, 2014 WL 12792707, at *2 (quotations omitted) (citing Fed. R. Civ. P. 45(d)). "Vague and conclusory assertions are not sufficient; rather, a showing of undue burden must be specific and concrete." *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, 2019 WL 5864595, at *2 (D.D.C. Nov. 8, 2019) (granting motion to compel against third party) (quotations omitted). "Assertions of an undue burden without specific estimates of staff hours needed to comply should be categorically rejected." *Id.* (quotations omitted). "When a nonparty actually has an interest in the outcome of the case, that interest is accounted for when analyzing the totality of the circumstances." *Id.* at *4 (quotations omitted); *see also id.*

("[d]isclosure is also favored when the nonparty was substantially involved in the underlying transaction and could have anticipated that such transaction could potentially spawn litigation or discovery") (quotations omitted).

**ARGUMENT**

The Court should compel NMPA to (1) search and produce from the custodial files of David Israelite pursuant to X's subpoena in response to X's Request for Production Nos. 1-10, 12-13; and (2) otherwise produce documents responsive to X's Request for Production Nos. 1, 2 5, 6, 8, 10, and 13 in its possession, custody, or control.

**I.    NMPA SHOULD BE COMPELLED TO PRODUCE DOCUMENTS FROM MR. ISRAELITE'S CUSTODIAL FILES**

**A.    Mr. Israelite Has Relevant Documents**

There is no question that Mr. Israelite's custodial files contain relevant documents.  As NMPA admits and publicly states, Mr. Israelite oversees NMPA.  That he did not technically "operate" the program by personally sending NMPA Notices on a day-to-day basis is of no moment, as ████████████████████████████████████████████████████ ██████████████████████████████████████████████████  Indeed, the limited documents produced in the Tennessee Action ███████████████████████  and Mr. Israelite's public statements confirm that he is not merely a figurehead.  *See, e.g.*, Ex. 6 (NMPA0000000001) at 001-003 ███████████████████████████████████████████ Ex. 13 (PL0000312482) at 482 ███████████████████████████████████████████ ██████  Ex. 19 at 5 (referring to Twitter "as his top legal focus") (quotations omitted); Ex. 15 (NMPA0000002544) at 544 ████████████████████████████████████████████████ ██████████████████████████████

These documents strongly indicate that Mr. Israelite possesses documents that are highly relevant to the Tennessee Action.  For example, Mr. Israelite has documents related to the decision to initiate the campaign of NMPA Notices against X and NMPA's motives, strategy, and desired outcomes of sending the NMPA Notices.  These documents are therefore critical to X's ability to establish NMPA's knowledge of X's DMCA notice system and its intent in selecting the format/method by which NMPA would submit the NMPA Notices, which are central to X's defense against NMPA's claim that X was dilatory in removing infringing works and responding to alleged serial infringers on the X platform.  The documents are also relevant to X's equitable estoppel affirmative defense, as they will help establish whether NMPA knowingly submitted the NMPA Notices using a format/method that was incompatible with X's systems with the intent to hamper X's ability to respond to the Notices and remove infringing content.

In addition, the documents suggest that Mr. Israelite possesses other documents related to the knowledge of NMPA, and by extension the knowledge of Plaintiffs, with respect to allegedly infringing material on the X platform and the actions NMPA chose to take or not take about sending NMPA Notices to X on behalf of Plaintiffs.  X needs to obtain these documents so that it can establish when NMPA first became aware of posts allegedly infringing the copyrighted works on the X platform—facts which are central to X's statute of limitations defense.  The documents are also necessary to establish NMPA's knowledge that infringing content remained on the X platform after it received the NMPA Notice, and NMPA's decision not to follow up with X regarding that noticed content.  Evidence that NMPA knowingly allowed infringing content (of which NMPA knew X was unaware) to remain on the X platform is highly relevant to X's equitable estoppel defense.  And all of these documents are responsive to X's document requests, including

NMPA's agreement to produce "all documents and communications concerning the NMPA Notices" (RFP No. 1). *Supra* Section D.

Courts do not hesitate to grant motions to compel to add document custodians in similar circumstances. *See Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 322 F.R.D. 1, 8 (D.D.C. 2017) (granting motion to compel CEO as custodian; "it strains reason to suggest that the principal owner and CEO of a company, who has publicly commented on the importance and magnitude of litigation … would have no unique information relevant to that litigation in his possession"); *see also Jones v. Varsity Brands, LLC*, 2021 WL 5889984, at *7 (W.D. Tenn. Dec. 13, 2021) (ordering company to add custodian because his "unique involvement as CEO … make[s] it likely that a search of his files would recover highly responsive documents").

This information is not available from other sources. It appears that Mr. Israelite often operates independently of NMPA's only current custodian (Ms. Mustico), and has had conversations regarding the NMPA Notices and this lawsuit independent of her, including with (a) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (b) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (c) other members of the music industry; and (d) the press. *See* Ex. 13 (PL0000312482) at 482 ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 14 (PL0000319652) at 653 ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 19 at 5 (Mr. Israelite called X the "top legal focus" at an Association of Independent Music Publisher meeting); Ex. 21 at 2 of 5 (commenting in the press on X's motion to dismiss); Ex. 22 at 3 of 6 (similar). These communications are not contained in NMPA's production to date, and there is no reason to believe they will appear in Ms. Mustico's files.

As the documents cited herein make clear, Mr. Israelite was ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████ and operated as the public face of, and spokesperson for, the NMPA Notice program. Accordingly, NMPA's search of Ms. Mustico's custodial files alone is deficient because it fails to capture highly relevant responsive documents that fall within the scope of what the NMPA agreed to produce.

### B.    Searching Mr. Israelite's Documents Will Not Be Unduly Burdensome

NMPA has not substantiated any claim of burden regarding searching Mr. Israelite's documents. It has merely stated that responding to the subpoena has been burdensome (Ex. 25 at 2, 4 (4/22/25 email)), but it has made no effort to explain or quantify why conducting a search of Mr. Israelite's custodial files would be unduly burdensome. This type of cursory, vague claim of burden is insufficient. *See, e.g.*, *Fairholme Funds*, 2019 WL 5864595, at *3 (third party's "arguments are not specific enough to warrant a finding of an undue burden," including where it "has not provided any details regarding the resources and effort required to produce the requested materials"). NMPA has not provided an estimate of how many hours of work the additional search production would entail. *See id.* Nor has it articulated "the volume of material requested, the ease of searching for the requested documents ... and whether compliance threatens [NMPA's] normal operations." *Stati v. Republic of Kazakhstan*, 2020 WL 3259244, at *8 (D.D.C. June 5, 2020) (granting motion to compel third party production) (quotations omitted). Any assertion from NMPA that it would be burdensome to produce documents from Mr. Israelite's custodial files is also inconsistent with NMPA's position that he was not involved in the notice program. If that is truly the case, then some agreed-upon searches should be easy to run to provide that confirmation. There would be nothing burdensome about that.

Even if NMPA had given any "specific details about the production process, establishing that production would be burdensome is still not enough—production must be *unduly*

burdensome." *Fairholme Funds*, 2019 WL 5864595, at *4. This analysis "requires balancing the burden against other factors." *Id.*; *see also* Fed. R. Civ. P. 26(b)(1) (requiring consideration of "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."). In the Tennessee Action, Plaintiffs seek hundreds of millions of dollars in damages for X's alleged noncompliance with notices *created and sent by NMPA*. *See* Ex. 1 ¶ 213 (seeking "statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed"). X merely asks that NMPA— ███████████████████

████████████████████████████████████████ (Ex. 15

(NMPA0000002544)), and subsequently acted on Plaintiffs' behalf sending NMPA Notices—to add *one single custodian* to its search.

To the extent NMPA makes a burden argument based on the fact that it is a "non-party," it should be given little weight because the organization has "been involved with the underlying factual issues in this case from the beginning." *Fairholme Funds*, 2019 WL 5864595, at *4; *see also United Biologics, LLC v. Amerigroup Tennessee, Inc.*, 2022 WL 2286197, at *5 (E.D. Tenn. June 23, 2022) (affording burden arguments less weight and ordering additional production of discovery where subpoenaed non-party had "an interest in this lawsuit"). █████████████

████████████████████████████████ Ex. 15

(NMPA0000002544).[5]

---

[5]    In fact, NMPA's counsel, who also represents Plaintiffs in the Tennessee Action, has acknowledged that NMPA has unique and highly relevant documents that cannot be obtained from Plaintiffs or any other source. They "direct[ed] [X] to the forthcoming production in response to the NMPA subpoena" when responding to inquiries regarding Plaintiffs' production deficiencies.

Finally, NMPA cannot rely on the apex doctrine to insulate Mr. Israelite's files from being searched and produced.  The apex doctrine concerns depositions, not document custodians.  *See Rosinbaum v. Flowers Foods, Inc.*, 238 F. Supp. 3d 738, 749 (E.D.N.C. 2017) ("In no case of which the court is aware has the apex doctrine successfully been invoked to shield an executive from a request for production of documents.").[6]  Not only does Mr. Israelite have unique knowledge, but he is also overseeing a 15-person organization where there has allegedly only been one person dealing with the NMPA Notices on a day-to-day basis.  *See Ray v. BlueHippo Funding, LLC*, 2008 WL 4830747, at *2 (N.D. Cal. Nov. 6, 2008) (apex doctrine not a bar where potential deponent "does have personal knowledge, which is not surprising given that BlueHippo is a relatively small company");  *cf. Rosales v. FitFlop USA, LLC*, 2013 WL 12416060, at *5 (S.D. Cal. Jan. 4, 2013) (not applying apex doctrine, in part, "given the admittedly small size of the company with decision-making authority delegated only to high-level executives").[7]

Searching Mr. Israelite's documents is not unduly burdensome, and NMPA should not be permitted to shield Mr. Israelite's documents from production.  NMPA should be compelled to

---

Ex. 28 at 6 (4/30/25 email).  They also argued that certain Plaintiff entities were unable to produce responsive documents because of "the realities of how these issues were handled and how the NMPA notice program was managed."  *Id.* at 4 (5/15/25 email).

[6]  *See also Blankenship v. Fox News Network, LLC*, 2021 WL 2345972, at *3 n.5 (S.D. W. Va. June 8, 2021) (apex doctrine "applies only to protect senior executives from attending costly and distracting depositions rather than from merely collecting and producing documents"); *see, e.g.*, *Page v. Bragg Communities, LLC*, 2022 WL 17724407, at *3 (E.D.N.C. Dec. 15, 2022) (ordering addition of former company president as custodian over apex doctrine objections where defendants failed to show that he was "unlikely to possess information relevant to Plaintiffs' claims and have not demonstrated that including [him] as a custodian would be unduly burdensome or otherwise improper"); *Dyson, Inc. v. Sharkninja Operating LLC*, 2016 WL 1613489, at *1 (N.D. Ill. Apr. 22, 2016) (apex doctrine did not shield plaintiffs' "global leader" from producing relevant emails).

[7]  It is also possible that by designating only Ms. Mustico, NMPA may assert that many (if not most) of her key responsive documents are privileged.  That, of course, will be a separate dispute (if and when NMPA actually produces all of the documents it has promised).

search the files of Mr. Israelite, and produce all documents responsive to RFP Nos. 1-10, 12-13—consistent with NMPA's written responses to the subpoena and subsequent compromises during the conferral process (*see* Ex. 24; Ex. 25 at 4-5)—that are located as a result of those searches. Any documents NMPA withholds on the basis of privilege should also be produced on a privilege log compliant with Fed. R. Civ. P. 45.

## II.    NMPA SHOULD BE COMPELLED TO PRODUCE CRITICAL DOCUMENTS THAT IT ALREADY AGREED TO PRODUCE

NMPA represented that it would produce several categories of documents in response to X's subpoena.  However, more than two months have elapsed since that representation, and no such documents have been produced to date.  With a fact discovery deadline looming on July 17, 2025, NMPA should be compelled to produce those documents immediately.

NMPA *has already agreed* to produce various categories of documents, effectively conceding their relevance and scope:

***Documents About NMPA's Methods Of Submitting Notices***.  NMPA agreed to produce documents concerning the NMPA Notices, as well as documents about "whether to submit NMPA Notices to X via X's Copyright Complaint Form" and about "the decision to continue to submit NMPA Notices to X via email."  Ex. 24 at 4-5, 8-9 (RFP Nos. 1, 5, and 6).  However, NMPA's production does not contain any documents reflecting discussions of the method(s) by which notices would be submitted to X.  These documents— ███████████████████████████████████ ██████████████████████████████████████████████████████ (*see* Ex. 8; *supra* Section B)—are relevant to whether X "fail[ed] to act on takedown notices in a timely manner" or "to take reasonable steps in response to severe serial infringers," which are two of the three bases for Plaintiffs' remaining contributory infringement claim.  Ex. 3.

***Documents About Following Up With X About Allegedly Infringing Posts Or Users***. NMPA agreed to produce documents concerning "whether to inform X that any Copyrighted Works listed in an NMPA Notice continued to appear on the X platform after the NMPA Notice was sent to X" and concerning "whether or not to request that any users of the X platform be terminated or suspended from X, Including copies of any such requests." Ex. 24 at 10-12 (RFP Nos. 8, 10). Yet again, with the respect to this category, NMPA's production contains no such documents. These documents are relevant to determining the reasonableness of X's response to the NMPA Notices (Ex. 3) and to X's equitable estoppel affirmative defense (Ex. 4 at 27). Whether NMPA chose not to follow-up with X about the alleged infringement it was monitoring on the X platform or to notify X specifically that it believed certain users were supposed to be terminated, ███████████████████████████████████████████████████████████ directly impacts the credibility of Plaintiffs' claims regarding X's purported inaction and goes to X's purported knowledge of any alleged infringement.

***Presentations About The NMPA Notices.*** Although NMPA agreed to produce documents related to the NMPA Notices (Ex. 24 at 4-5 (RFP No. 1)), it has not produced any presentations or reports to be shared with NMPA members regarding the NMPA Notice program. Indeed, NMPA has not produced any presentations at all. Nor has it produced anything prepared for its board meetings. For all of the reasons set forth herein, X has a reasonable basis to believe that such documents exist, and would be responsive to X's subpoena because they undoubtedly contain discussions of NMPA Notices sent to X. For example, Mr. Israelite gave a "wide-ranging presentation" in 2023 in which he discussed X as NMPA's "top legal focus" and its response to NMPA Notices. Ex. 19. He has referenced ███████████████████████████ ███████ Ex. 13. Any presentations or reports from NMPA to its board and/or to Plaintiffs,

including communications relating to strategy and results, are particularly relevant because they reflect the reasonableness of X's response to notices to respond to "severe serial infringers." *See* Ex. 3. The documents are also important to establishing NMPA's and Plaintiffs' knowledge—specifically with respect to NMPA's actions taken on Plaintiffs' behalf in executing the NMPA Notice program—and the timing of Plaintiffs' knowledge of alleged infringements, which relates to X's statute of limitations defense.

      *Documents About* ███████████████████ NMPA agreed to produce documents related to the NMPA Notices (Ex. 24 at 4-5 (RFP No. 1)) and documents and communications between itself and any third party retained relating to the NMPA Notices (*id.* at 14-15 (RFP Nos. 13)). It also agreed to produce communications relating to X, this lawsuit, and the NMPA Notices that it had with a specific vendor NMPA retained for the NMPA Notice program. *Id.* at 5-6 (RFP No. 2). However, NMPA has not produced any documents ████████ ████████████████████████████████████████████ ████████████████████████ *See* Ex. 6 at 003. Although it has produced some documents reflecting that ████████████████████████ (Ex. 16 (NMPA0000000020)), NMPA has not produced any documents ████████████ ████████████████████████ These documents are relevant to show that NMPA's motive for initiating its notice program against X was not to obtain the removal of allegedly infringing videos posted to the X platform, but to inflict maximum pain on X's business so that X would be more inclined to enter into music licenses with NMPA's members. *See also* Ex. 1 ¶¶ 1, 8, 11 (discussing licenses).

      Instead of producing these documents, NMPA dragged its feet, making just two productions totaling 589 documents (of which nearly 100 were "junk" email attachments

containing no substance) over the course of nearly three months.  *See* Scher Declaration at ¶¶ 30, 31.  The Court should compel NMPA to produce what it promised.  *See Axis Ins. Co. v. Am. Specialty Ins. & Risk Servs., Inc*., 340 F.R.D. 570, 574 (N.D. Ind. 2021) (affirming order compelling party to produce documents it had already agreed to produce where the party "had not lived up to its agreement" to produce them); *Novi Footwear Int'l Co. v. Earth OpCo LLC*, 740 F. Supp. 3d 73, 78-79 (D. Mass. 2024) (sanctioning party for failure to timely produce documents after previously granting motion to compel where party had said it was "continuing to provide the requested discovery or work with the plaintiffs to identify reasonable alternatives"); *see also Jet Blast, Inc. v. Blue Lake Serv., LLC*, 2025 WL 841612, at *2 (N.D. Fla. Feb. 26, 2025) (sanctioning party for failure to timely produce documents responsive to discovery requests it had not objected to by the agreed-upon date).

NMPA has no excuse for its continued failure to produce these highly relevant documents. Despite expressly agreeing in March to produce them, NMPA has failed to do so.  The time for excuses has long passed—NMPA should be compelled to meet its discovery obligations without further delay.[8]

## **CONCLUSION**

For the foregoing reasons, X respectfully requests an order compelling NMPA to immediately to produce responsive documents from Mr. Israelite's custodial files in response to

---

[8]  NMPA cannot reasonably argue it would be burdensome to produce the documents it already agreed to produce.  It has not once mentioned burden, and it has made no effort to substantiate such a claim.  *See Fairholme Funds*, 2019 WL 5864595, at *3; *supra* Section I.B.  NMPA also cannot rely on any burden argument on the basis that it is a non-party.  As the entity that developed the strategy and managed the day-to-day execution of the program sending NMPA Notices on Plaintiffs' behalf, NMPA has unique and highly relevant documents (such as internal communications or communications with or about the third parties that it retained) that cannot be obtained from Plaintiffs or any other source.  *See also supra* n.5 (Plaintiffs' counsel directing X to NMPA's forthcoming production to defend its own lack of email production).

RFP Nos. 1-10, 12-13, and to otherwise produce all documents responsive to X's requests for: (i) documents concerning the method by which NMPA Notices would be submitted to X (RFP Nos. 1, 5, and 6); (ii) documents concerning whether to follow-up with X regarding any alleged infringement continuing to appear on the X platform or about requesting the termination or suspension of any specific users (RFP Nos. 8 and 10); (iii) any presentations or reports about the NMPA Notice program (RFP No. 1); and (iv) documents concerning efforts to ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (RFP Nos. 1, 2, and 13).

Respectfully submitted,

Dated: May 30, 2025

*/s/ David Needham*
David Needham (DC Bar No. 1017372)
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I Street NW, Suite 900
Washington, District of Columbia 20005
Tel: (202) 538-8000
Fax: (202) 538-8100
davidneedham@quinnemanuel.com

Andrew H. Schapiro (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART & SULLIVAN LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
andrewschapiro@quinnemanuel.com

*Attorneys for Petitioner X Corp.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 30, 2025, a true and correct copy of the foregoing and all related notices, declarations, and exhibits to which National Music Publishers' Association is entitled under the protective order in the underlying action, were served on counsel for National Music Publishers' Association using the below email addresses:

| | |
|---|---|
| Scott Zebrak: | Scott@oandzlaw.com |
| Alex Kaplan | Alex@oandzlaw.com |
| Daryl Kleiman | DKleiman@oandzlaw.com |
| Meredith Stewart: | MStewart@oandzlaw.com |

Additionally, I HEREBY CERTIFY that on May 30, 2025, I caused a true and correct copy of the foregoing and all related notices, declarations, and exhibits to which National Music Publishers' Association is entitled under the protective order in the underlying action, to be served on counsel for National Music Publishers' Association by mail via first class mail on:

National Music Publishers' Association
c/o Scott Zebrak
Oppenheim + Zebrak, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, D.C. 20016
United States

                                   */s/ David Needham*
                                   David Needham